Clerk of the Court					July 7, 2008
US District Court of Columbia
Constitution Avenue, NW.
 Room 1225
Washington, D.C. 20001
U.S.A.

Dear Honorable Clerk of Court:

   Let me apologize for any missing enclosures that should have been included previously. This missing document is enclosed herewith. Please excuse the inconvenience.   08-1247 ESH

Respectfully,

*Hortencio Arcelo*
Hortencio Arcelo
San Guillermo
San Marcelino
2207 Zambales
Philippines 601

Attachments

*[Handwritten note: Let this be filed ESH 7/30/08]*

# TREATY OF PEACE (TREATY OF PARIS)

*Signed at Paris December 10, 1898*
*Senate advice and consent to ratification February 6, 1899*
*Ratified by the President of the United States February 6, 1899*
*Ratified by Spain March 19, 1899*
*Ratifications exchanged at Washington April 11, 1899*
*Entered into force April 11, 1899*
*Proclaimed by the President of the United States April 11, 1899*
*Article IX amended by protocol of March 29, 1900* [1]
*Article III supplemented by convention of November 7, 1900* [2]

30 Stat. 1754; Treaty Series 343

The United States of America and Her Majesty the Queen Regent of Spain, in the name of her August Son Don Alfonso XIII, desiring to end the state of war now existing between the two countries, have for that purpose appointed as Plenipotentiaries:

The President of the United States,
William R. Day, Cushman K. Davis, William P. Frye, George Gray, and Whitelaw Reid, citizens of the United States;

and Her Majesty the Queen Regent of Spain,
Don Eugenio Montero Ríos, President of the Senate,
Don Buenaventura de Abarzuza, Senator of the Kingdom and ex-Minister of the Crown,
Don José de Garnica, Deputy to the Cortes and Associate Justice of the Supreme Court,
Don Wenceslao Ramirez de Villa-Urrutia, Envoy Extraordinary and Minister Plenipotentiary at Brussels, and
Don Rafael Cerero, General of Division;

Who, having assembled in Paris, and having exchanged their full powers, which were found to be in due and proper form, have, after discussion of the matters before them, agreed upon the following articles:

---

[1] TS 344, *post*, p. 622.
[2] TS 345, *post*, p. 623.

## ARTICLE I

Spain relinquishes all claim of sovereignty over and title to Cuba.

And as the island is, upon its evacuation by Spain, to be occupied by the United States, the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property.

## ARTICLE II

Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones.

## ARTICLE III [a]

Spain cedes to the United States the archipelago known as the Philippine Islands, and comprehending the islands lying within the following line:

A line running from west to east along or near the twentieth parallel of north latitude, and through the middle of the navigable channel of Bachi, from the one hundred and eighteenth (118th) to the one hundred and twenty seventh (127th) degree meridian of longitude east of Greenwich, thence along the one hundred and twenty seventh (127th) degree meridian of longitude east of Greenwich to the parallel of four degrees and forty five minutes (4° 45′) north latitude, thence along the parallel of four degrees and forty five minutes (4° 45′) north latitude to its intersection with the meridian of longitude one hundred and nineteen degrees and thirty-five minutes (119° 35′) east of Greenwich, thence along the meridian of longitude one hundred and nineteen degrees and thirty five minutes (119° 35′) east of Greenwich to the parallel of latitude seven degrees and forty minutes (7° 40′) north, thence along the parallel of latitude seven degrees and forty minutes (7° 40′) north to its intersection with the one hundred and sixteenth (116th) degree meridian of longitude east of Greenwich, thence by a direct line to the intersection of the tenth (10th) degree parallel of north latitude with the one hundred and eighteenth (118th) degree meridian of longitude east of Greenwich, and thence along the one hundred and eighteenth (118th) degree meridian of longitude east of Greenwich to the point of beginning.

The United States will pay to Spain the sum of twenty million dollars ($20,000,000) within three months after the exchange of the ratifications of the present treaty.

## ARTICLE IV

The United States will, for the term of ten years from the date of the exchange of the ratifications of the present treaty, admit Spanish ships and

---

[a] For a supplement to art. III, see convention of Nov. 7, 1900 (TS 345), *post*, p. 623.

Case 1:08-cv-01247-ESH    Document 4    Filed 07/30/2008    Page 4 of 17

merchandise to the ports of the Philippine Islands on the same terms as ships and merchandise of the United States.

## ARTICLE V

The United States will, upon the signature of the present treaty, send back to Spain, at its own cost, the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces. The arms of the soldiers in question shall be restored to them.

Spain will, upon the exchange of the ratifications of the present treaty, proceed to evacuate the Philippines, as well as the island of Guam, on terms similar to those agreed upon by the Commissioners appointed to arrange for the evacuation of Porto Rico and other islands in the West Indies, under the Protocol of August 12, 1898,* which is to continue in force until its provisions are completely executed.

The time within which the evacuation of the Philippine Islands and Guam shall be completed shall be fixed by the two Governments. Stands of colors, uncaptured war vessels, small arms, guns of all calibres, with their carriages and accessories, powder, ammunition, livestock, and materials and supplies of all kinds, belonging to the land and naval forces of Spain in the Philippines and Guam, remain the property of Spain. Pieces of heavy ordnance, exclusive of field artillery, in the fortifications and coast defences, shall remain in their emplacements for the term of six months, to be reckoned from the exchange of ratifications of the treaty; and the United States may, in the mean time, purchase such material from Spain, if a satisfactory agreement between the two Governments on the subject shall be reached.

## ARTICLE VI

Spain will, upon the signature of the present treaty, release all prisoners of war, and all persons detained or imprisoned for political offences, in connection with the insurrections in Cuba and the Philippines and the war with the United States.

Reciprocally, the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain the release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.

The Government of the United States will at its own cost return to Spain and the Government of Spain will at its own cost return to the United States, Cuba, Porto Rico, and the Philippines, according to the situation of their respective homes, prisoners released or caused to be released by them, respectively, under this article.

---

*TS 343½, *ante*, p. 613.

## Article VII

The United States and Spain mutually relinquish all claims for indemnity, national and individual of every kind, of either Government, or of its citizens or subjects, against the other Government, that may have arisen since the beginning of the late insurrection in Cuba and prior to the exchange of ratifications of the present treaty, including all claims for indemnity for the cost of the war.

The United States will adjudicate and settle the claims of its citizens against Spain relinquished in this article.

## Article VIII

In conformity with the provisions of Articles I, II, and III of this treaty, Spain relinquishes in Cuba, and cedes in Porto Rico and other islands in the West Indies, in the island of Guam, and in the Philippine Archipelago, all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the Crown of Spain.

And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be.

The aforesaid relinquishment or cession, as the case may be, includes all documents exclusively referring to the sovereignty relinquished or ceded that may exist in the archives of the Peninsula. Where any document in such archives only in part relates to said sovereignty, a copy of such part will be furnished whenever it shall be requested. Like rules shall be reciprocally observed in favor of Spain in respect of documents in the archives of the islands above referred to.

In the aforesaid relinquishment or cession, as the case may be, are also included such rights as the Crown of Spain and its authorities possess in respect of the official archives and records, executive as well as judicial, in the islands above referred to, which relate to said islands or the rights and property of their inhabitants. Such archives and records shall be carefully preserved, and private persons shall without distinction have the right to require, in accordance with law, authenticated copies of the contracts, wills and other instruments forming part of notarial protocols or files, or which may be contained in the executive or judicial archives, be the latter in Spain or in the islands aforesaid.

### Article IX

Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty,* a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.

The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.

### Article X

The inhabitants of the territories over which Spain relinquishes or cedes her sovereignty shall be secured in the free exercise of their religion.

### Article XI

The Spaniards residing in the territories over which Spain by this treaty cedes or relinquishes her sovereignty shall be subject in matters civil as well as criminal to the jurisdiction of the courts of the country wherein they reside, pursuant to the ordinary laws governing the same; and they shall have the right to appear before such courts, and to pursue the same course as citizens of the country to which the courts belong.

### Article XII

Judicial proceedings pending at the time of the exchange of ratifications of this treaty in the territories over which Spain relinquishes or cedes her sovereignty shall be determined according to the following rules:

1. Judgments rendered either in civil suits between private individuals, or in criminal matters, before the date mentioned, and with respect to which there is no recourse or right of review under the Spanish law, shall be deemed to be final, and shall be executed in due form by competent authority in the territory within which such judgments should be carried out.

2. Civil suits between private individuals which may on the date mentioned be undetermined shall be prosecuted to judgment before the court

---

* For an extension of time for declaration of intention to retain Spanish nationality, see protocol of Mar. 29, 1900 (TS 344), *post*, p. 622.

in which they may then be pending or in the court that may be substituted therefor.

3. Criminal actions pending on the date mentioned before the Supreme Court of Spain against citizens of the territory which by this treaty ceases to be Spanish shall continue under its jurisdiction until final judgment; but, such judgment having been rendered, the execution thereof shall be committed to the competent authority of the place in which the case arose.

### Article XIII

The rights of property secured by copyrights and patents acquired by Spaniards in the Island of Cuba, and in Porto Rico, the Philippines and other ceded territories, at the time of the exchange of the ratifications of this treaty, shall continue to be respected. Spanish scientific, literary and artistic works, not subversive of public order in the territories in question, shall continue to be admitted free of duty into such territories, for the period of ten years, to be reckoned from the date of the exchange of the ratifications of this treaty.

### Article XIV

Spain shall have the power to establish consular officers in the ports and places of the territories, the sovereignty over which has been either relinquished or ceded by the present treaty.

### Article XV

The Government of each country will, for the term of ten years, accord to the merchant vessels of the other country the same treatment in respect of all port charges, including entrance and clearance dues, light dues, and tonnage duties, as it accords to its own merchant vessels, not engaged in the coastwise trade.

This article may at any time be terminated on six months' notice given by either Government to the other.

### Article XVI

It is understood that any obligations assumed in this treaty by the United States with respect to Cuba are limited to the time of its occupancy thereof; but it will upon the termination of such occupancy, advise any Government established in the island to assume the same obligations.

### Article XVII

The present treaty shall be ratified by the President of the United States, by and with the advice and consent of the Senate thereof, and by Her Majesty the Queen Regent of Spain; and the ratifications shall be exchanged at Washington within six months from the date hereof, or earlier if possible.

TREATY OF PEACE—DECEMBER 10, 1898                  621

In faith whereof, we, the respective Plenipotentiaries, have signed this treaty and have hereunto affixed our seals.

Done in duplicate at Paris, the tenth day of December, in the year of Our Lord one thousand eight hundred and ninety eight.

| | |
|---|---|
| WILLIAM R. DAY | [SEAL] |
| CUSHMAN K. DAVIS | [SEAL] |
| WM. P. FRYE | [SEAL] |
| GEO. GRAY | [SEAL] |
| WHITELAW REID | [SEAL] |
| EUGENIO MONTERO RÍOS | [SEAL] |
| B. DE ABARZUZA | [SEAL] |
| J. DE GARNICA | [SEAL] |
| W. R. DE VILLA URRUTIA | [SEAL] |
| RAFAEL CERERO | [SEAL] |

take effect until it should be accepted by the Philippine Legislature or by a convention called for that purpose. The first section of the act was not accepted.

H. Rept. 968, 73d Cong., 2d sess., pp. 2, 3.

Congress passed another act, the so-called "Tydings-McDuffie act", approved by the President on March 24, 1934, providing for the complete independence of the Philippine Islands upon the expiration of a period of ten years from a specified date and upon compliance with certain conditions. This act, like that of 1933, was not to take effect until accepted by the Philippine Legislature or by a convention called for that purpose by the Legislature. It authorizes the Philippine Legislature to provide for the election of delegates to a constitutional convention to formulate and draft a Constitution "for the government of the Commonwealth of the Philippine Islands". Section 2 provides that the Constitution shall be republican in form, shall contain a bill of rights, and shall provide that, "pending the final and complete withdrawal of the sovereignty of the United States" over the Islands, all citizens and officers of the Philippine Islands shall owe allegiance to the United States. Pending the attainment by the Islands of complete independence, all acts of the Legislature of the Commonwealth are to be reported to the Congress of the United States and certain acts, namely, those relating to currency, coinage, imports, and immigration, are not to become effective until approved by the President of the United States. Section 2 further provides that meanwhile the foreign affairs of the Islands "shall be under the direct supervision and control of the United States"; that the decisions of the courts of the Commonwealth shall be subject to review by the Supreme Court of the United States (as now provided by law); and that the United States shall have the right to intervene for the preservation of the government of the Commonwealth, for the protection of life, property, and individual liberty, and for the discharge of government obligations under and in accordance with the provisions of the Constitution.

*[margin: Independence Act of 1934]*

*[margin: Constitution of the Commonwealth]*

The act provides (sec. 3) that the Constitution to be drafted and approved by the constitutional convention should be submitted to the President of the United States and, if certified by him to conform to the act, to the people of the Philippine Islands for their ratification (sec. 4); that such ratification should be deemed an expression of the will of the people of the Philippine Islands in favor of independence; and that when obtained, and proclaimed by the President of the United States, "the existing Philippine Government shall terminate and the new government shall enter upon its rights", etc.

the British Empire, France, and Japan relating to their insular possessions and insular dominions in the region of the Pacific Ocean, 43 Stat. 1646; 4 Treaties, etc. (Trenwith, 1928) 4853). Replying on April 3, 1924 the Department of State said:

> The controversies referred to in [the treaty] . . . do not, as indicated in the declaration accompanying the Treaty, embrace questions which, under the principles of international law, lie exclusively within the domestic jurisdiction of the respective powers. The question whether independence shall be granted to the Philippine Islands is one which lies exclusively within the domestic jurisdiction of the United States. I, therefore, do not consider that the Treaty mentioned, the declaration accompanying the Treaty, or the Treaty supplementary thereto, concluded February 6, 1922, in any manner affect the exclusive right of this Government to withhold or to grant independence to the Islands in question.

Representative Fairfield to Secretary Hughes, Mar. 25, 1924, and Mr. Hughes to Mr. Fairfield, Apr. 3, 1924, MS. Department of State, file 811b.01/03.

*No treaty obligation*

In a communication of October 3, 1930, addressed to the Department of State, it was asked whether there was any obligation under any treaty entered into at any time on the part of the United States, either with Spain or directly with the Philippine people, wherein the United States was in any manner bound to a promise of independence of the Islands. Replying on October 10, 1930 the Department said that—

> there is no treaty provision by which the United States promises the independence of the Philippine Islands. Such independence lies wholly in the discretion of the United States to be exercised through the appropriate Constitutional method. The United States has made no agreement on the subject nor has there been any authoritative or official promise on the subject by either the executive or Congress. The Sixty-fourth Congress in a preamble to the present Organic Act (Statutes at Large, Vol. 39, Par. 1, p. 545) on this subject and various Presidents have made statements as to the ultimate purpose of the United States in certain circumstances or conditions. No such statements, of course, constitute an official commitment of the Government.

Representative McCormick to the Department of State, Oct. 3, 1930, and Assistant Secretary Castle to Mrs. McCormick, Oct. 10, 1930, MS. Department of State, file 811b.01/139.

*Act of 1933*

On January 17, 1933 the so-called "Hare-Hawes-Cutting act", to enable the people of the Philippine Islands to adopt a constitution and form a government, to provide for the independence of the islands, and for other purposes, was passed by Congress over a presidential veto (47 Stat. 761–770). The act provided that it should not

TERRITORIAL POSSESSIONS OF THE UNITED STATES 497

48 Stat. 456-465; MS. Department of State, file 811b.01/215; H. Doc. 355, 73d Cong., 2d sess.; S. Doc. 43, 74th Cong., 1st sess.

On November 5, 1935 the Minister of the Union of South Africa presented to the Secretary of State an inquiry from the South African Department of Customs and Excise relative to the classification of the Philippine Islands for customs and statistical purposes. The Secretary of State replied that until the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty in the Philippines as provided in section 10 (a) of the Independence Act, "sovereignty over the Philippine Islands rests with the United States."

*Sovereignty*

Secretary Hull to the Minister of the Union of South Africa, Nov. 15, 1935, MS. Department of State, file 811b.01/263. See, to the same effect, the Legal Adviser of the Department of State to Comptroller Pearlove of the Department of Administration and Finance of Minnesota, Nov. 25, 1936, *ibid.* 811b.01/304.

In the case of *Cincinnati Soap Co. v. United States*, decided by the Supreme Court of the United States on May 3, 1937, involving the constitutionality of an appropriation to the Philippine treasury of certain processing taxes provided for in section 602½ of the Revenue Act of 1934 (48 Stat. 680, 763), the Court said:

> The Philippine Islands and their inhabitants, from the beginning of our occupation, have borne a peculiar relation to the United States. The Islands constitute a dependency over which the United States for more than a generation, has had and exercised supreme power of legislation and administration, *Posadas v. National City Bank*, 296, U.S. 497, 502, a power limited only by the terms of the treaty of cession and those principles of the Constitution which by their nature are inherently inviolable.

With reference to the effect of the Philippine Independence Act of 1934, the Court said:

> But it is contended that the passage of the Philippine Independence Act of March 24, 1934, c. 84, 48 Stat. 456, and the adoption and approval of a constitution for the Commonwealth of the Philippine Islands have created a different situation; and that since then, whatever may have been the case before, the United States has been under no duty to make any financial contribution to the islands. Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been and, for a long time may not be, finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory. By express provision of the Independence Act, we still retain powers with respect to our trade relations with the islands, with certain exceptions set forth particularly in the act. We retain powers



High Commissioner

The act authorizes the President to appoint, by and with the advice and consent of the Senate, a United States High Commissioner to the government of the Commonwealth of the Philippine Islands, to be the representative of the President in the Islands, to have access to the records of the government of the Commonwealth, and to be furnished by the Chief Executive of the Commonwealth with such information as he shall request. <u>The government of the Commonwealth is authorized to be represented in the United States by a Resident Commissioner with a non-voting seat in the House of Representatives.</u> (Sec. 7.)

Independence in ten years

<u>Section 10 of the act stipulates that on the fourth day of July immediately following the expiration of a period of ten years from the date of the inauguration of the government of the Commonwealth, the President of the United States "shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands ... and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force".</u>

Neutralization

Section 11 requests the President of the United States, at the earliest practicable date, to enter into negotiations with foreign powers with a view to the conclusion of a treaty for the perpetual neutralization of the Philippine Islands, if and when Philippine independence shall have been achieved. Section 12 provides that upon the proclamation and recognition of the independence of the Philippine Islands, the President shall notify foreign governments thereof and invite their recognition of such independence.

Section 15 repeals certain laws and parts of laws and provides for the continuance in force of others until they shall be altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States.

A concurrent resolution accepting the act was adopted by the Senate and House of Representatives of the Philippine Legislature in joint session on May 1, 1934.

Constitution approved

A Constitution of the Philippines was adopted by a Philippine constitutional convention on February 8, 1935. On March 23, 1935, the President of the United States notified the Governor General of the Philippine Islands that the proposed Constitution had been submitted to him and that he certified that "the same conforms substantially with the provisions of the Act of Congress approved March 24, 1934".

with respect to their financial operations and their currency; and we continue to control their foreign relations. The power of review by this court over Philippine cases, as now provided by law, is not only continued, but is extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands.

Thus, while the power of the United States has been modified, it has not been abolished. Moral responsibilities well may accompany the process of separation from this country; and, indeed, they may have been intensified by the new and perplexing problems which the Philippine people now will be called upon to meet as one of its results. The existence and character of the consequent obligations and the extent of the relief, if any, which should be afforded by the United States in respect of them, are matters, not for judicial but for Congressional consideration and determination.

301 U.S. (1937) 308, 313-314, 319-320.

*Diplomatic formalities*

As to the honors which should be accorded the President of the Philippine Commonwealth during a visit to a foreign state, the Department of State on January 29, 1937 said that—

the Philippine Commonwealth is not an independent state and its President is not entitled to the honors usually accorded to a chief of state. Sovereignty of the Philippine Islands remains with the United States and the only official of the United States entitled to such honors is the President of the United States. When the Commonwealth Government was inaugurated, it was decided that the High Commissioner to the Philippine Islands, representing the President of the United States, should have precedence over the President of the Commonwealth and that both of those officials should be entitled in the Philippines to salutes of 19 guns.

Until such time as the Philippine Commonwealth becomes entirely free and independent of the United States, it is expected that when honors are rendered any official of the Philippine Commonwealth, the flag of the United States be displayed.

Secretary Hull to Ambassador Johnson, Jan. 29, 1937 (telegram), MS. Department of State, file 811b.001 Quezon, Manuel L./55.

In circular instructions to certain diplomatic and consular officers on Apr. 28, 1937 Assistant Secretary Carr said:

"A ruling was made at the time of the inauguration of the Commonwealth Government establishing the rank of the President of the Philippine Commonwealth as analogous to that of a Governor of a State and providing that the President of the Commonwealth would rank with, but after, the United States High Commissioner to the Philippines.

"This same ruling also prescribed that both the United States High Commissioner and the President of the Philippine Commonwealth would be entitled to a salute of nineteen guns in Philippine territory or Philippine waters, on which occasion only the flag of the United States should be flown. In consequence, the President of the Philippine Commonwealth has

TERRITORIAL POSSESSIONS OF THE UNITED STATES                                499

> not recognized international status and should not be accorded the honors usually given a chief of state. Moreover, he is not entitled to any salutes or honors outside of Philippine territory or Philippine waters.
>
> "If in connection with any ceremony or celebration outside of the Philippines involving the Philippine Islands or one of its officials, the flag of the Philippine Commonwealth is displayed, the flag of the United States should also be flown and given the honor position to the right of (observer's left), or above the Philippine flag.
>
> "The heads of diplomatic missions, as representatives of the President of the United States, take precedence in the countries to which they are accredited over the President of the Philippine Commonwealth.
>
> "It is requested that, when an occasion arises which, in your opinion requires such action, the substance of this instruction be brought to the attention of the appropriate authorities."
>
> MS. Department of State, file 811b.01/341a.

In a letter to the Secretary of State on April 30, 1936, with reference to the subject of extradition between the Philippine Islands and foreign countries, the Acting Attorney General said: — *Extradition*

> This involves, inter alia, interpretation of the provision in the Philippine Independence Act that "foreign affairs shall be under the direct supervision and control of the United States," [Sec. 2(a) (10), Act of March 24, 1934, 48 Stat. 457.] As a matter of first impression this provision appears to be somewhat indefinite and suggests the question whether the Congress contemplated that the Government of the Commonwealth of the Philippine Islands should deal with foreign nations subject to supervision and control or in just what manner, and by whom, foreign affairs affecting the Philippine Islands should be handled.

The Acting Attorney General having requested the views of the Department of State, the Secretary of State, with a letter dated May 26, 1936, submitted a memorandum reading in part as follows:

> The provision of the 10th subdivision of Section 2(a) of the Act of March 24, 1934, is one of a number of provisions which the bill required should be contained in the Constitution of the Philippines and which should be in effect "pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands". <u>The object of these temporary provisions was to maintain the responsibility of the United States for the general conduct of the government of the Philippines during the ten-year transition period, at the end of which the islands were to become completely independent.</u>
>
> . . . It will be observed that the principal part of the Constitution [of the Philippine Islands adopted by the constitutional convention in pursuance of the act of Congress of March 24, 1934], which contains sixteen articles, is drawn in such form that it will become completely effective, without change, when the islands become independent. However, there is appended to the Constitution an ordinance setting forth the special relationship



500      CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

between the Philippine Islands and the United States during the transition period, while the United States remains sovereign in the islands. These provisions accord with the provisions contained in Section 2(a) of the Act of March 24, 1934. Thus the language of the 10th subsection of Section 1 of the ordinance is the same in phraseology as that of Section 2(a) (10) of the Act of March 24, 1934.

     *Philippines not a sovereign state*

Both the Acts of Congress and the ordinance appended to the Constitution of the Philippines show clearly that it was intended that full sovereignty over the Philippines was to be retained by the United States during the transition period of ten years provided for in the Act. They show that, while the government of the Philippine Islands was to have a large measure of self-government, they were not to constitute a separate sovereign state under the rules of international law. In other words, it was clearly intended that the United States and the Philippine Islands should continue to constitute a single state. This is made clear, not only by the provision that the foreign affairs of the Philippines "shall be under the direct supervision and control of the United States", but also by the various other provisions contained in the Act, and repeated in the ordinance appended to the Constitution setting forth in detail the continued authority and responsibility of the United States in the Philippines during the transition period. Among them is the provision, to which special attention has already been called, under which the President of the United States may intervene for the preservation of the government of the Commonwealth of the Philippines, for the protection of life, property and liberty and "for the discharge of government obligations under and in accordance with the provisions of the constitution".

. . . It is believed that it is the intent of the statutory provision in question that foreign affairs pertaining to the Philippine Islands are to be conducted and not merely supervised by the United States. The use of the adjective "direct" before the word "supervision", and the addition of the words "and control" seem to emphasize this point. Needless to say, the Government of the United States, acting through the High Commissioner to the Commonwealth of the Philippine Islands, may call upon the government of the latter for cooperation and assistance in matters pertaining to foreign affairs, including the extradition of criminals, as well as the protection of aliens in the islands, but it is believed that communications between the government of the islands and foreign governments must be carried on through the High Commissioner.

It may be well to make mention of the following provision of Section 12(9) of Article VIII of the Constitution of the Philippines:

"The President shall have power, with the concurrence of a majority of all the Members of the National Assembly, to make treaties, and with the consent of the Commission on appointments, he shall appoint ambassadors, other public ministers and

consuls, and he shall receive ambassadors and other ministers duly accredited to the Government of the Philippines."

It cannot be maintained that the provision just quoted overcomes or in any way limits the provisions of the statutes and ordinance that during the transition period foreign affairs shall be under the direct supervision and control of the United States. On the contrary, it is quite clear that the provision of Section 12(9) of Article VIII of the Constitution is subject to and limited by the provision of Section 1(10) of the ordinance, just as other provisions in the principal part of the Constitution are, during the said period, subject to and limited by provisions in the ordinance. The whole object of the ordinance is to maintain the authority and responsibility of the United States in the islands during the period in question, and it necessarily follows that they place limitations upon the authority of the government of the Philippines during the same period. . . . It seems clear that, in view of the statutory provision under discussion, the President of the Philippines could not perform these functions unless expressly authorized by the Government of the United States. It has been suggested that Philippine citizens might be sent as commercial agents to foreign countries, but, for the reasons mentioned, the sending of such persons would also be subject to the authorization of the United States. The provision of the Act of March 24, 1934, under consideration evidently covers all matters concerning foreign affairs which pertain to the Philippines.

Unfortunately, the report of the Committee on Territories and Insular Affairs of the Senate of March 15, 1934, concerning the bill, S. 3055, which became the Act of March 24, 1934, contains no special discussion of the particular provision of the Statute in question. It may be observed, however, that the report calls attention to the fact that the bill was a "proposal to reenact the Hare-Hawes-Cutting bill" with certain exceptions having no application to the provision now under consideration. In this connection it may further be observed that in the report of the Committee, of February 24, 1932, concerning the Hare-Hawes-Cutting bill, there appears the following passage:

"It is also provided that foreign relations of the Islands shall be *exclusively* under the control and supervision of the United States, and that our Government at any time may intervene to prevent a violation of international obligations." [Italics added.]

The statutory provision in question, as construed in the Committee's report just quoted, is believed to be eminently wise. With regard to the delicate and important functions pertaining to the conduct of foreign affairs, it is impossible to have a divided authority.

For the reasons mentioned, it seems clear that it was not the intent of Congress that the Government of the Philippines

*[margin: Diplomatic Officers]*




502  CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

should, during the period in which the United States retains sovereignty over the Philippines, deal directly with foreign governments in matters relating to the extradition of criminals.

The Acting Attorney General (Keenan) to the Secretary of State (Hull), Apr. 30, 1936, US Department of State, file 200.11B/13; Mr. Hull to Attorney General Cummings, May 25, 1934, ibid. 200.11B/16, enclosing a memorandum prepared in the Office of the Legal Adviser (200.11B/15).

With reference to the question of granting a visa to a member of the household of President Quezon of the Philippine Commonwealth, the Department of State on June 3, 1937 said:

"Philippine Government officials are considered to be foreign government officials for visa purposes in view of [the] language of [the] Philippine Independence Act."

Secretary Hull to Consul General Southard, June 3, 1937 (telegram), MS. Department of State, file 811.111 Diplomatic/10251.

## GUANO ISLANDS

### §77

The Department of State expressed the following opinion in 1907 regarding the legal status of guano islands appertaining to the United States:

> ... the United States possess no sovereign or territorial rights over guano islands. United States citizens who discover guano, or their assigns, are protected by this Government in the prosecution of their enterprise which extends only to appropriation and disposal of the guano thereon. This protection is extended under the Acts of Congress on the subject, compiled in Title 72 of the Revised Statutes of the United States.

The Assistant Secretary of State (Bacon) to Messrs. Dudley and Michener, Jan. 3, 1907, MS. Department of State, file 3120.

To the same effect, see the Acting Secretary of State (Adee) to Mr. Miles Carpenter, July 25, 1907, ibid. Minor File, vol. 12; the Third Assistant Secretary of State (Phillips) to Mr. H. M. Walker, July 13, 1914, ibid. file 811.0141/13; the Acting Secretary of State (Phillips) to Representative John Jacob Rogers, Apr. 28, 1922, ibid. 811.0141SW2/77; the Acting Secretary of State (Castle) to Mr. R. F. Nichols, Sept. 1, 1922, ibid. 811.0141/54.

The act of August 18, 1856 (Sections 5570–78 R.S.; sections 1411–19, Title 48 U.S.C.) does not vest title to any of the Guano Islands to which it applies in the discoverer but merely authorizes the President, in his discretion, to protect the discoverer or his assigns in the exclusive right of occupying such island, rocks or keys for the purpose of obtaining guano and of selling and delivering the same to the United States to be used therein. In Duncan v. Navassa Phosphate Company (137 U.S. 647), the Supreme Court of the United States said, "The whole right con-